IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| QUANDARIAN FAULKNER<br>Plaintiff, | : | |
| | : | |
| vs. | : | CIVIL ACTION 17-0077-WS-MU |
| | : | |
| JEFFERSON DUNN, *et al.*,<br>Defendants. | : | |
| | : | |

## REPORT & RECOMMENDATION

Plaintiff Quandarian Faulkner, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983. This action has been referred to the undersigned for appropriate action pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. Gen. LR 72(a)(2)(R). After careful review, it is recommended that summary judgment should be **GRANTED** in favor of Defendants Wall, Langford, Dunn, Stewart, Raybon, Kidd, Scarborough, Vignolo, Smith, Mixon, and Mitchell as to all claims asserted against them. As to the remaining officer defendants and alleged constitutional violations, it is recommended that summary judgment, be **GRANTED,** in part, and **DENIED,** in part, for the reasons stated herein.

## I.    Summary of Factual Allegations.[1]

### a.    Complaint.

Plaintiff Faulkner alleges that members of the Alabama Department of Corrections Emergency Response Team ("CERT Team") used excessive force

---

[1] The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riveria Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000).

against him on November 9, 2016, when the CERT Team entered B-Dorm (or Bravo Unit) at approximately 6:30 a.m. and immediately began harassing and assaulting inmates.[2] (Doc. 1 at 5). In his complaint, Faulkner specifically details:

> [A]bout 4 or 5 cert team members came to my bed dressed in full riot gear and hit me with a stick and told me to get up and don't look at them. I was beat all the way to the bathroom, and was told to lay down on the floor face down in handcuffs where other inmates were being beaten and hollering, I was taken to the healthcare unit only to be refused treatment, and the riot team members took me back to B-Dorm and continue to beat me and call me derogatory names, I was asking other officers that was standing around for help, and heard some of them say fuck you, you didn't ask for help Monday. After they finished beating the inmates, me and several other inmates that was beaten unconscious were taken to segregation, where I laid up in a cell begging for help, I felt like I was dieing [sic] I was in so much pain, I could not breathe. I wrote letters to the Warden, captain asking for help. The I.C.S. officer came back there and I begged him to please get me some help because I could not breathe, finally two cert team members came and took me to the health care where I was told by the nurses that my body was not breathing on the left side, the doctor told me that I needed free world help immediately that they couldn't determine what was going on inside me, I was taken to the free world hospital where they immediately stuck a chest tube inside me, I stayed there for hours, and was moved to Mobile hospital where I stayed for 4 days. I was taken back to lock up with stitches that was left in me for over a month, and not once was my wounds cleaned causing greenish coloration. I had to beg[] the health care unit to remove the stitches and clean my wounds. I still at the filing of this complaint have difficulties breathing.

(Doc. 1 at 6).

---

[2] Faulkner claims the CERT Team made "statements like: 'Where the GD's, Crips and Bloods at now', 'Aryan Brotherhood and Nations where yall at', 'on C.E.R.T. We will beat your Ass', Yall Bitches and Fuck Niggers stood up the other day Standup now' . . . 'Yall stabbed Warden Davenport and Killed Officer Bettis, pull something out now on C.E.R.T. we will beat your Ass.'" (Doc. 1 at 5-6).

Plaintiff Faulkner alleges that the force used on November 9, 2016 was pre-cipitated by an incident that occurred on November 7, 2016. According to Faulkner, on November 7, 2016, members of the CERT Team, as well as other correctional officers, entered B-Dorm to conduct an institutional count of the inmates. (Doc. 1 at 5). On that date, inmates had placed "makeshift tents" on their beds to "gain some space from the inmate he shares the 5'x 6' living area with", and officers ordered inmates to remove the tents. (Id.). Faulkner claims while the inmates removed the tents, one of the CERT Team members "aggressively" broke a stick from inmate Quandarian Faulkner's bed which "resulted in a reaction from the C.E.R.T. Members, Correctional Officers present and the Inmates, after a brief stillness, the count was conducted and the C.E.R.T. TEAM Members and Count Team exited the dorm." (Id.). Faulkner explains:

> Approximately two days later on November 9, 2016, at approximately 6:30 a.m. over 50 members of the Alabama Department of Corrections C.E.R.T. Team, entered Bravo Unit armed with their Riot Gear (helmets with face shields, neck collar, body vest, shields, while at least One-Hundred (100) of the One-Hundred and Fourteen (114), inmates assigned to Bravo Unit was sound asleep, and immediately assaulted the inmates like they were animals, without provocation, because the majority of the inmates were harmlessly asleep, after about 35 to 45 minutes of assaulting the inmates, the C.E.R.T. Team members, placed plastic restraining tyes[sic] on the inmates to lay face down on their beds while other C.E.R.T. Team members was parading up and down Bravo Unit still assaulting and harassing the inmates. . . .

(Doc. 1 at 5) (alterations in capitalization).

Plaintiff Faulkner is suing Alabama Department of Corrections Commissioner Jefferson Dunn, Associate Commissioner Grantt Culliver, Warden Cynthia

Stewart, Warden Terry Raybon, Warden Phillip Mitchell, Captain Darryl Fails, Lieutenant Ashley Kidd, Officer Gary Scarborough, Officer Timothy Vignolo, and members of the Alabama Department of Corrections Emergency Response Team ("CERT Team") who participated in the contraband search in Holman Correctional Facility's B-Dorm on November 9, 2016.[3]  Faulkner seeks compensatory and punitive damages against each defendant in the amount of $200,000.00, declaratory and injunctive relief, trial by jury, and "such other relief as the law and this Court deem just." (Doc. 1 at 17).

### b. Defendants' Answers and Special Reports.

All defendants have answered the suit denying the allegations against them and filed special reports in support of their positions.

---

[3] Faulkner originally named as defendants in this action, Alabama Department of Corrections Emergency Response Team, Nurse 1, Nurse 2, Nurse 3, Nurse 4, and Cubicle Officer assigned to Cubicle 1.  (Doc. 1).  "As a general matter, fictitious-party pleading is not permitted in federal court." Richardson v. Johnson, 598 F.3d 734, 738 (11th Cir. 2010); see also CSX Transp., Inc. v. United Transp. Union, 236 F. App'x 562, 563 n.1 (11th Cir. 2007) ("the Federal Rules do not authorize suit against fictitious parties"), cert. denied, 552 U.S. 1243, 128 S. Ct. 1475, 170 L. Ed. 2d 297 (2008); Featherstone v. Home Oil Co., 2011 U.S. Dist. LEXIS 139102, 2011 WL 5978774, at *1 n.4 (S.D. Ala. Nov. 8, 2011) (subject to a limited exception, "fictitious party practice is not permitted in federal court"). The limited exception to this rule is when the plaintiff's description of the defendant is so specific as to be "at the very worst, surplusage." Dean v. Barber, 951 F.2d 1210, 1215-16 (11th Cir. 1992).
    In the instant case, Faulkner's attempt to file suit against "Alabama Department of Corrections Emergency Response Team", "Nurse 1", "Nurse 2", "Nurse 3", and "Nurse 4" fails, as these are inadequate descriptions to identify the necessary persons.  These unnamed persons are incapable of being served and are not defendants in this action.  Furthermore, the "Cubicle Officer" was terminated from this action on April 14, 2017.

Defendants Cynthia Stewart, Terry Raybon, Phillip Mitchell, Ashley Kidd, Gary Scarborough, and Timothy Vignolo, as part of their special report, have submitted pertinent prison documents which include the November 9, 2016 Incident report, Use of Force report, I&I Investigative report, disciplinary records,[4] medical records, and defendant officers' affidavits. Defendants contend that Faulkner was a suspect in the November 7, 2016 incident and, again, "acted out" during the November 9, 2016 incident.[5] (Doc. 27 at 8). Defendants claim:

> Inmate Faulkner was angrily defiant and refused to comply with direct and repeated orders that were given for him to lie down on his assigned bed and put his hands behind his back. Given the overall threatening circumstances, including inmate Faulkner's hostile conduct and his outright refusal to comply with direct and repeated orders, officers were left with no choice but to use the minimal physical force needed, which included basic riot baton movements, to gain control over Faulkner and this increasingly dangerous situation.

(Id.). The submitted Incident Report provides details of the Nov. 9 search, as well as facts leading to the incident, stating:

> On November 7, 2016, the Southern CERT members entered B-Dormitory and ordered all inmates to remove sticks and tied up blankets from their beds. The inmates refused to comply and became very hostile and aggressive toward the CERT members. The inmates gathered in a threatening and intimidating manner around the CERT members stating, "This is 2016, and we run this, slavery is over with, we already done killed one of y'all." Several unidentified inmates were observed with handmade knives in their possession. The CERT members were able to exit the dormitory without incident. The inmates with handmade knives were later identified by the CERT members through IMAS. On November 9, 2016, at approximately

---

[4] Faulkner was charged with gathering in a threatening or intimidating manner around the Southern Cert team on November 7, 2016, but was found not guilty of the charges after a due process violation, failure to timely serve Faulkner with the charges. (Doc. 27-21 at 2-4).

[5] Reference to the November 7, 2016, and November 9, 2016, incidents subject of this report may hereinafter be referred to as the Nov. 7 and Nov. 9 incident, respectively.

6:35 a.m., the North Central, South Central, and Southern Team CERT Teams entered B-Dormitory to arrest the suspects. . . . All inmates were given orders to report to their assigned beds, lie down, and place their hands behind their back.  The following inmates failed to comply with the orders given: . . . Quandarian Faulkner B/294289 . . . . The CERT Team used force to include impact weapons and physical force on the above mentioned inmates to get them to comply with the orders given . . . . The inmates were arrested and escorted to the health care unit for medical assessments. . . .

(Doc. 27-2 at 31-32).  The CERT Team's Nov. 9 search resulted in the confiscation of thirty (30) handmade knives and eleven (11) inmates were charged with failure to obey a direct order of an ADOC employee and allowed to remain in population pending the disciplinary action, while twenty-one (21) inmates, including Quandarian Faulkner, were transferred to segregation pending disciplinary actions for failing to obey a direct order, gathering in a threatening or intimidating manner, and unauthorized possession of a weapon or device that could be used as a weapon (as these inmates were identified as participants in the Nov. 7 incident).  (Id. at 32).

The Use of Force Investigative Report found that the CERT team members entered B-Dorm on Nov. 9 with "full tactical gear and riot shields in hand while armed with intermediate non/Lethal impact weapons such as: MK-37 rifles, 12-gauge bean bag round shotguns and 37 mm lethal weapons."  (Doc. 27-2 at 34). None of these weapons, however, was used on "aggressive" inmates.  (Id.).  The investigation revealed that "combative" inmates were "apprehended by utilizing empty hand techniques by way of two-on-one takedowns, and non-lethal force by way of baton and performing different angle thrust with the tip of the batons.  Baton strikes were angled towards the chest and back areas of the aggressive and combative subjects."  (Id.).  The investigator concluded (after reviewing the techniques

used to the inmates' injuries listed on the body charts) that the use of force was "minimal, "justified", "reasonable", and "necessary to gain compliance with the non-compliant inmates."[6] (Id.).

The CERT team members who have been named as defendants[7] in this action have incorporated by reference the prior reports filed by Defendants in this

---

[6] The investigating official determined:

> [T]here was evident proof of immediate threats to the safety of the officers, staff, inmates, and the institution based on the actively combative subjects who were apprehended. All forms of verbal de-escalation had failed; therefore, the level of resistance changed the level of force[] that was applied. The severity of the incident gains notice when considering the number of inmates who were actively involved and fully resistant with weapons in hand. The minimal amount of force was used to gain control of each subject involved in the incident.

(Doc. 27-2 at 34).

[7] Defendant CERT team members include, unless specifically stated otherwise, Defendants Charles Arthur, Jeffery Baldwin, Daryl Brown, Jermaine Bullard, David Dennis, Ernest Duren, Akeem Edmonds, Harry Finklea, Demetrives Fleeton, Danny Fountain, Marcus Gaston, James Griffin, Jr., Antony Hadley, Harrison, DeJour Knight, Aaron Lewis, Jasper Luitze, Teddy Jones, Antonio McClain, Larry McCovery, Nathan McQuirter, Cordaro Melton, Jason Norris, Alfie Pacheco, Omar Parker, Gregory Patterson, John Pryor, Timothy Robinson, Clifton Sanders, Smith, Samuel Snelson, Jesse Stanford, William Streeter, Steve Terry, Corbin Tunstall, Bradley Walker, Dominic Whitley, and Jesse Wilson.

The complaint identifies "Smith" as a CERT team member and named defendant. In response to the suit, Defendants contend "there is no way to determine *Smith's* first name from [the complaint]." (Doc. 99 at 2). Defendants, however, acknowledge the existence of an ADOC employee named "Otis Smith". Defendants further contend that Captain Otis Smith is the Commander of the Central CERT team and was not present at Holman on November 9, 2016. (Id. at 3). Captain Otis Smith, also, affirms by affidavit that the Central CERT team he commands was not present at Holman on November 9, 2016, and neither was he personally present nor did he participate in the Nov. 9 incident subject of this suit. (Docs. 99-1; 122-2).

Additionally, Sergeant Terry Edwards, member of the North Central CERT

action into their own and further supplemented the report with personal affidavits of the CERT team members and factual details of the incident. (Docs. 83, 103, 122, 124). The CERT team defendants reiterate that Faulkner was confirmed as a suspect from the Nov. 7 incident, wielding a weapon, and threatening officers. (Doc. 83 at 9). Upon entry into B-Dorm on Nov. 9 to arrest the identified suspects and to confiscate the prison made weapons, Captain Jeffery Baldwin, Commander of the North Central CERT team, instructed CERT team members to give direct orders for all inmates in B-Dorm to lie face down on their beds and cross their legs at the ankles and/or place their hands behind their back, prior to the CERT team entering the dorm. Captain Baldwin then instructed the ballistic shields to enter the dorm first, followed by the 12-gauge shotgun with less lethal ammunition and 37 mm lethal gas guns to be staged strategically at the front of the dormitory.

Officer Melton was assigned to carry the shield through B-Dorm; Sgt. Luitze and Officer Parker were assigned to the front of the dorm armed with the 37 mm less lethal gas gun, as was Officer Edmonds with a 12-gauge, bean bag, less lethal shotgun. Lt. Griffin secured the dorm from the top of the bathroom wall, armed with his "shot gun at port arms." (Doc. 83 at 10). To ensure inmate compliance, CERT rovers were instructed to patrol the two aisles of B-Dorm and secure all inmates with flex cuffs behind their backs. Officers Tunstall, Brown, Harrison, and Snelson assisted in securing flex cuffs on the inmates and escorting them to the

team on November 9, 2019, was ordered to and has submitted a special report in response to this action. (Doc. 122-1). To date, however, Sergeant Edwards has not been named as a party to this suit and is therefore not considered a defendant in this action.

front of the dorm.  Officers Lewis and Robinson assisted in "escorting several inmates from their beds to the shower area."  (Doc. 83 at 11; Doc. 124-1).  Once inmates were secured, a search for contraband was conducted.  As to Plaintiff Faulkner, Defendants claim:

> Inmate Faulkner, who was implicated as a suspect in the Monday, November 7, 2016 incident, was acting out again on November 9, 2016 near an area where someone was heard hollering "knife" with other combative and noncompliant inmates.  Inmate Faulkner was angrily defiant and refused to comply with direct and repeated orders that were given for him to lie down on his assigned bed and put his hands behind his back.  Given the overall threatening circumstances, including inmate Faulkner's hostile conduct and his outright refusal to comply with direct and repeated orders, officers were left with no choice but to use the minimal physical force needed, which included basic riot baton movements, to gain control over Faulkner and this increasingly dangerous situation.  The use of force was terminated once inmate Faulkner's resistance ceased and inmate Faulkner was able to be placed in the appropriate restraints.

(Doc. 83 at 11-12).  Defendants maintain that Faulkner was escorted by foot to the health care unit where he was medically evaluated around 8:30 a.m. the morning of Nov. 9 and "was reassigned to segregation where he was also escorted on foot." (Id. at 14).

In denying allegations that Faulkner received inadequate medical treatment, Defendant Nurses Ashley Wall and Johnathan Langford ("Wall" and "Langford", respectively, and together "medical defendants") have submitted a copy of Faulkner's medical records (and further contend Faulkner's claims should be dismissed for failure to exhaust available administrative remedies).  The medical records show that Nurse Weaver evaluated Faulkner at approximately 8:30 a.m. on November 9, 2016.  The body chart notes that Faulkner's single complaint was, "my ass hurts."  (Doc. 54-5 at 10).  His vital signs were within normal ranges (blood

pressure: 113/85; pulse: 101, and temperature: 98.1), his skin is described as being "warm/dry/intact," and his lungs were noted as "clear, bilateral". (Id).

Upon transfer to the segregation unit on November 9, 2016, an Initial Health Review form was executed by Nurse Wall. The screening form indicates that at approximately 8:30 a.m., Faulkner was assessed. At that time, his vital signs are reported as identical to those noted on the body chart and the record indicates that there are no signs of trauma. The assessment by Nurse Wall states, "See original body chart". (Doc. 54-5 at 33). Nurse Wall affirms by affidavit, however, that she did not personally examine Faulkner prior to signing the screening form. (Doc .54-3 at 2).

The following day, November 10, 2016, Faulkner was evaluated in the health care unit at 11:35 a.m., by Nurse Gray, for complaints of shortness of breath and chest pain, and that "I got whooped." (Doc. 54-5 at 8). His blood pressure was measured at 158/100, pulse at 122, and temperature at 98. Faulkner described his sharp stabbing pain (that worsened with a deep breath) as rating a 10, on a pain scale of 1 through 10, and stated it was a problem he had never experienced before. Nurse Gray noted shortness of breath upon examination and observed clear lung sounds in Faulkner's right lung but no sounds in his left lung. Faulkner was immediately transferred to the local hospital for suspected pneumothorax (or collapsed lung), where the presumed diagnosis was confirmed by x-ray.[8]

---

[8] The Consultation Request for a chest X-ray was submitted by Dr. Patrick Arnold on November 10, 2016. (Doc. 54-5 at 16). The request described, "Patient was involved in a one on one with correction officers and complains of difficulty breathing and severe chest pain" that started "one day ago." (Id.). The request explains

Faulkner was then transferred to Mobile Infirmary Medical Center, in Mobile, Alabama, for treatment, namely the placement of a chest tube.[9]  The chest tube was removed on November 13, 2016, and Faulkner returned to Holman on November 14, 2016 where he was placed in the segregation housing unit.  ((Doc. 54-5 at 13, 32).

### c.  Plaintiff Faulkner's Response to Defendants' Special Reports.

In his response to the Defendants' Special Reports, Plaintiff Faulkner challenges Defendants' assertion that he was a named "suspect" in the Nov. 7 incident. Faulkner posits that there were no suspects identified prior to the morning of Nov. 9 and that CERT team defendants simply:

> singled out several one of which was Faulkner, and beat him, Faulkner, while Faulkner was restrained causing the lung in Faulkner's chest to be punctured and again instead of doing a decent inspection of Plaintiff's medical complaints at the time of the interview . . . on November 9, 2016, after the [CERT] team were authorized and did carry out a sunrise attack on unsuspecting inmates at the [Holman] facility.

(Doc. 106 at 2-3).  Faulkner restates that the CERT team "zip tied" all inmates with their hands behind their backs, "restrained and unable to fight back," and never

_____

that Faulkner possessed "good breath sounds on right; decreased or absent breath sounds on left both anteriorly and posteriorly."  (Id.).  The request was approved by Dr. Hood on November 11, 2016.  (Id. at 15).  The records from Atmore Community Hospital, including the x-ray report, are not a part of the current record.

[9] The Inpatient Notification Form, completed by Nurse Ellen Gray, states that Faulkner presented to the health care unit with complaints of chest pain and shortness of breath following "an altercation on 11-9-16.  [Faulkner] was sent to Atmore Community Hospital for CXR 11-10-16 and was transferred and admitted to Mobile Infirmary."  (Doc. 54-5 at 14).

Notably, the record currently before the court does not contain the medical records from Mobile Infirmary beyond the discharge instructions and prescribed medications.

gave any other orders.  (Id. at 4, 6).  He contends that four CERT team members beat him "unceremoniously" and punctured his lung because he was unable to protect his rib area with his hands tied behind his back.  (Id. at 5).  He further claims that he complained of severe pain and difficulty breathing "all day" without being treated.  (Id.).

### d. Motion for Summary Judgment.

After review of the pleadings, the Court ordered that Defendants' Answers, Special Reports, and exhibits (Docs. 26, 27, 36, 37, 53, 54, 65, 66, 82, 83, 102, 103, 120, 122, 124, 125) be treated as a motion for summary judgment.  (Doc. 115).  In response to the motion for summary judgment, Plaintiff Faulkner reiterates his claim for excessive force and the injuries he received, and further disputes that he acted in a "violent, misbehaving fashion" (doc. 118 at 3-6) and maintains that he was "in compliance with ADOC rules and regulations, was not being disruptive, was following orders that CERT members direct" but was "severely beaten" until he crawled on his knees to the bathroom area at the front of B-Dorm.  (Doc. 126 at 1-2).  Faulkner challenges the nondescript declarations put forth by the CERT team defendants through their affidavits and opines their responses exemplify the "code of silence that law enforcement is prone to utilize[ing] in such situations as this instant litigation."  (Doc. 126 at 3-4) (capitalization altered).

Faulkner further maintains that Grantt Culliver is responsible for the excessive force applied to him, because Culliver ordered the CERT team to "takeover"

Holman and "show those inmates . . . who the actual boss is."[10]  (Doc. 118 at 4)

(alterations to capitalization).    Additionally, Faulkner contends that the Corizon

medical staff denied him medical care on the day of the incident.  He alleges he

repeatedly complained of chest pain and an inability to breathe, yet the Corizon

defendants in this action ignored his complaints (despite that his symptoms indi-

cated damage to internal organs, including his lungs), failing to examine or fully

evaluate him.[11]  (Id. at 5).  Once placed in his segregation cell, an officer conduct-

ing a routine walk through in the unit responded to Faulkner's beating on the cell

door and took Faulkner to the health care unit for complaints of spitting up blood

and chest pain.  (Id. at 6).

After reviewing the record, including Plaintiff's response to this motion, it is

determined that this motion for summary judgment is now ripe for consideration.

---

[10] Specifically, Faulkner alleges "[t]he demonstration of power was the brainchild of the NOW RECOGNIZED FELONIOUS GRANTT CULLIVER, THE ASSISTANT COMMISIOMER OF THE ADOC, that misused the authority vested in same by the State of Alabama, to DIRECT THE CERT TEAM TO THE HCF INSTITUTION AND SHOW THOSE INMATES THAT RESIDE THERE WHO THE ACTUAL BOSS IS." (Doc. 118 at 4).

[11] Although his description is unclear, Faulkner appears to allege that his physical complaints were not noted on the body chart as is typical procedure for completing a body chart.  Faulkner states:

> The plaintiff was dismissed from the infirmary at the HCF institution after being given a "BODY" chart, a quick glance inspection of the subjects body, noting all visible injuries to same with the complaints of the plaintiff subject of said evaluation (BODY CHART) are to writ-ten by the evaluating medical professional on the stated "BODY CHART" form.  This did not happen, as a matter of fact the medical professionals took their orders and gave the inmates to the ADOC employees very quickly, with deliberate indifference to the said com-plaints of the inmates that did need medical attention.

(Doc. 118 at 7).

## II.    Summary Judgment Standard.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see</u> <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 247-248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."); <u>Garczynski v. Bradshaw</u>, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'") (emphasis omitted)).

The party asking for summary judgment "always bears the initial responsi-bility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the ab-sence of a genuine issue of material fact." <u>Celotex</u>, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of mate-rial fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. <u>Id</u>. at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affida-vits, or by the 'depositions, answers to interrogatories, and admis-sions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmov-ing party "must do more than show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp</u>., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538

(1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. <u>See</u> <u>Anderson</u>, 477 U.S. at 255.

<u>ThyssenKrupp Steel USA, LLC v. United Forming, Inc.</u>, 926 F. Supp. 2d 1286, 1289-90 (S.D. Ala. Jan. 29, 2013) (citations omitted).

The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts. A genuine dispute requires more than "some metaphysical doubt as to material facts." <u>Garczynski</u>, 573 F.3d at 1165 (internal citations omitted). A "mere scintilla" of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment. *Id.* In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials be-fore it on summary judgment." <u>Resolution Trust Corp. v. Dunmar Corp.</u>, 43 F.3d 587, 599 (11th Cir. 1995). More importantly, where "opposing parties tell two dif-ferent stories, one of which is blatantly contradicted by the record, so that no rea-sonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007); <u>see</u> <u>also</u> <u>Logan v.</u> <u>Smith</u>, 439 F. App'x 798, 800 (11th Cir. Aug. 29, 2011) ("In cases where opposing parties tell different versions of the same events, one of which is blatantly contra-dicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations." (citations omitted) (unpublished)).

## III. Discussion.

### A. Immunity Defenses.

To the extent Plaintiff is proceeding against the correctional officer defendants in their official capacities, those claims fail.  The Eleventh Amendment, which specifically prohibits suits against "the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State," has long been held to apply "equally to suits against a state brought in federal court by citizens of that state." Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998).  "The state need not be formally named as a defendant for the amendment to apply; state officials sued in their official capacity are also protected by the amendment." Id. (citing Kentucky v. Graham, 473 U.S. 159, 166-67, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)).  Accordingly, the correctional officer defendants in this action, all of whom were employed by the State of Alabama Department of Corrections at the time of the incidents alleged in the complaint, are immune from suit in their official capacities.  See Parker v. Williams, 862 F.2d 1471, 1476 n.4 (11th Cir. 1989), overruled on other grounds in Turquitt v. Jefferson Cnty., 137 F.3d 1285 (11th Cir. 1998) ("[S]uits against an official in his or her official capacity are suits against the entity the individual represents.").  Thus, the officer defendants, in their official capacities, are entitled to summary judgment as a matter of law.

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)).  While there is no doubt that the defendants in this action were acting within their

discretionary authority at all times when the acts in question occurred, the Eleventh Circuit has made clear that the defense of qualified immunity "is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court decisions in <u>Hudson</u> and <u>Whitley</u>." <u>Skrtich v. Thornton</u>, 280 F.3d 1295, 1301 (11th Cir. 2002) (citation omitted). As to the remaining claims, officer defendants are entitled to qualified immunity unless Plaintiff can show that their conduct violated a clearly established statutory or constitutional right of which a reasonable person would have known. <u>See Belcher v. City of Foley, Ala.</u>, 30 F.3d 1390, 1395 (11th Cir. 1994). Therefore, the Court will now address whether this action identifies any constitutional violation.

**B.  Claims Under 42 U.S.C. § 1983.**

Plaintiff Faulkner proceeds pursuant to 42 U.S.C. § 1983. "In order for a plaintiff to establish a claim under 42 U.S.C. § 1983, he must prove (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under the color of state law." <u>Martinez v. Burns</u>, 459 F. App'x 849, 850-851 (11th Cir. 2012) (citing *Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005)). There is no dispute that the named defendants, as employees of the Alabama Department of Corrections and its contracted medical provider, are state actors for purposes of this action. Thus, to establish his asserted claims, Faulkner must establish that the named defendants, personally, acted to deprive him of a constitutional right.

In his complaint, Faulkner alleges that Defendants Jefferson Dunn[12] and Grant Culliver[13] are liable for excessive use of force, failure to protect, assault and battery, and implementation of the procedure used, as they are responsible for overseeing the operations of Holman Correctional Facility ("Holman").

He further alleges that Charles Arthur, Jeffery Baldwin, Daryl Brown, Jermaine Bullard, David Dennis, Ernest Duren, Akeem Edmonds, Darryl Fails, Henry Finklea, Demetrives Fleeton, Danny Fountain, Marcus Gaston, James Griffin, Anthony Hadley, Michael Harrison, Teddy Jones, Ashley Kidd, DeJour Knight, Aaron Lewis, Jasper Luitze, Antonio McClain, Larry McCovery, Nathan McQuirter, Cordaro Melton, Phillip Mitchell,[14] Mallorie Mixon, Jason Norris, Alfie Pacheco, Omar Parker, Gregory Patterson, John Pryor, Terry Raybon, Timothy Robinson, Clifton Sanders, Officer Scarborough , Smith, Samuel Snelson, Jesse Stanford, Cynthia Stewart, William Streeter, Steve Terry, Corbin Tunstall, Timothy Vignolo, Bradly Walker, Dominic Whitley, and Jesse Wilson are liable for excessive use of force, failure to protect, assault and battery, implementation of the procedure used, and denial of medical care.

---

[12] Faulkner claims that "Dunn is responsible [for] overseeing the operation of each of the facility within the Alabama Department of Corrections, including Holman and is responsible for the writing, implementation and enforcements of the regulations, Policies and Customs of the Alabama Department of Corrections." (Doc. 1 at 9).

[13] Faulkner claims that "Culliver is Commander and Chief of the C.E.R.T. Team and is responsible for overseeing and Operation of Holman Prison and ensuring that the Employees and inmates are protected and provided Medical Care." (Doc. 1 at 9).

[14] Faulkner incorrectly identifies, in his complaint, Defendant Phillip Mitchell as "C. Mitchell." (Doc. 1 at 11).

The Court will now address Plaintiff Faulkner's claims in turn.

### a. Excessive Force.

The Eighth Amendment's prohibition against cruel and unusual punishment, U.S. Const. amend. VIII, governs the use of force by prison officials against convicted inmates. Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir. 1999). In order to establish an Eighth Amendment excessive force claim against the defendants, Faulkner must prove both an objective and subjective component. That is, he must show that the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation and that the defendants "act[ed] with a sufficiently culpable state of mind; i.e., that they acted maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7, 112 S. Ct. 995, 999, 117 L. Ed. 2d 156 (1992) (citations omitted); see also Lumley v. City of Dade City, Fla., 327 F.3d 1186, 1196 (11th Cir. 2003) (to satisfy the object conduct, the plaintiff must show the complained of conduct "shocks the conscience").

"[W]here a prison security measure is undertaken to resolve a disturbance . . . that indisputably poses significant risks to the safety of inmates and prison staff, . . . the question of whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21; see also Skrtich v. Thornton, 280 F.3d 1295, 1300 (11th Cir. 2002). Factors relevant to this determination include the "need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the

responsible officials, and any efforts made to temper the severity of a forceful re-
sponse." <u>Skrtich,</u> 280 F.3d at 1300. When considering these factors, courts afford
"a wide range of deference to prison officials acting to preserve discipline and se-
curity, including when considering decisions made at the scene of a disturbance."
<u>Fennell v. Gilstrap</u>, 559 F. 3d 1212, 1217 (11th Cir. 2009) (quotation marks omit-
ted).

### 1. Defendants Not Present on November 9, 2016.

Defendants Jefferson Dunn, Grantt Culliver, Cynthia Stewart, Terry Ray-
bon, Gary Scarborough, Otis Smith, Mallorie Mixon, and Phillip Mitchell assert that
they were not at Holman on Nov. 9 (or during the incident),[15] and Ashley Kidd and

---

[15] Defendants Dunn, Culliver, Stewart, Raybon, Scarborough, Smith, Mixon, and
Mitchell assert the following by personal affidavit:
1. Jefferson Dunn declares that he was not present at Holman on November
   9, 2016 (Doc. 66-1);
2. Grantt Culliver declares that he was not present at Holman on November 9,
   2016 (Doc 66-2);
3. Cynthia Stewart declares that she "was not present when the CERT Team
   entered the facility" and "[d]ue to the inmates being unclothed for searches,
   [she] did not enter inside of the dormitory," although she did make rounds
   through the facility while the CERT team was in B-dorm and briefly looked
   inside the dorm but remained in the corridor for approximately two minutes
   (Doc. 27-10);
4. Terry Raybon declares that he did not report to work until 8:00 a.m. on No-
   vember 9, 2016, and was not present during the Nov. 9 incident in B-dorm
   (Doc. 27-8);
5. Gary Scarborough declares that he was not present during the Nov. 9 inci-
   dent, and this is supported by the Duty Post Log (which confirms Scar-
   borough was transporting another inmate to the Dothan Eye Clinic during
   the time of the incident subject of this complaint) (Doc. 27-9);
6. Otis Smith declares that he, Commander of the Central CERT team, was
   not involved in the Nov. 9 incident or present at Holman on Nov. 9 and nei-
   ther was the Central CERT team (Doc. 99-1; Doc. 122-2);
7. Mallorie Mixon declares that at the time of the incident, she was employed

Timothy Vignolo assert that they were not present in B-Dorm at the time of the incident.[16]  Faulkner has failed to allege facts sufficient to show otherwise or even dispute the affirmations.

"It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability." <u>Hartley v. Parnell</u>, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks and citation omitted).  If a supervisor's liability cannot be established based on the supervisor's personal participation in the complained acts, a plaintiff must show a causal connection between the supervisor's actions and the alleged constitutional deprivation.  <u>Brown v. Crawford</u>, 906 F.2d 667, 671 (11th Cir. 1990).

> A causal connection may be established when: 1) a "history of wide-spread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so; 2)  a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

_____

as a drug treatment counselor at Ventress Correctional Facility.  Mixon affirms that she has never worked at Holman and was not present at Holman on Nov. 9 (Doc. 103-2); and
8.   Phillip Mitchell declares he was not present during the Nov. 9 incident (Doc. 27-11).

[16] Defendants Kidd and Vignolo affirm the following by submitted affidavits:

1.  Ashley Kidd declares that she was not present during the Nov. 9 incident in B-Dorm, as she was assisting with the institutional shakedown of female employees entering the facility and supervising the institutional count (Doc. 27-12); and
2.  Timothy Vignolo declares that he was not present during the Nov. 9 incident because he was instructed by the CERT team to exit B-dorm and provide security in the main hall (Doc. 27-13).

<u>Valdes v. Crosby,</u> 450 F.3d 1231, 1237 (11th Cir. 2006) (citing <u>Cottone v. Jenne</u>, 326 F.3d 1352, 1360 (11th Cir. 2003)).  A custom is established by showing "a longstanding and widespread practice [such that it] is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." <u>Brown v. City of Fort Lauderdale</u>, 923 F.2d 1474, 1481 (11th Cir. 1991) (A custom requires showing a practice so settled and permanent that it takes on the force of law).  "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences."  <u>West Tillman</u>, 496 F.3d 1321, 1329 (11th Cir. 2007) (quotation marks and citations omitted).

In this action, the record is void of facts or suggestion that these named defendants personally participated in the Nov. 9 incident, were present in B-dorm during the incident, or are causally connected to the CERT team's actions or con-duct on Nov. 9.  Faulkner has failed to allege facts showing or indicating that the actions, be it a policy or custom put in place by the defendants, caused the exces-sive use of force on him by the CERT team on Nov. 9.  Consequently, Faulkner has failed to state a cause of action against Defendants Dunn, Stewart, Raybon, Kidd, Scarborough, Vignolo, Smith, Mixon, and Mitchell.

Contrarily, Faulkner has alleged that Grantt Culliver directed the CERT team to act unlawfully or knew that the CERT team would act unlawfully and failed to stop them from doing so. Grantt Culliver affirms by affidavit that he oversees both the day to day operations of all male adult correctional facilities and the CERT team.  Culliver further avers that he was not present at Holman on Nov. 9 and that

the actions described by Faulkner are not characteristic of CERT procedures or training. In response to the motion for summary judgment, Faulkner questions the veracity of Culliver's statements. (Doc. 106 at 3). Namely, Faulkner submits that the "elite and highly trained" CERT team would not be allowed to "run with their own directions at any time they felt it" but, instead, acts at the direction of its commanding officers. (Id.). Accordingly, Faulkner declares that Culliver directed the CERT team to "takeover" Holman and "show those inmates that reside there who the actual boss is" after being notified of the Nov. 7 incident by Warden Terry Raybon. (Doc. 118 at 4).

While acknowledging that "[u]nreliable conjecture . . . presented as a 'belief' without any basis in ascertainable fact, [is] not the type of admissible evidence required to survive a motion for summary judgment", Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1318 (11th Cir. 2011), the Court finds Faulkner has alleged sufficient facts, which if proven, could state a valid claim against Defendant Culliver. Resolving all ambiguities and drawing all justifiable inferences in favor of the nonmoving party, the Court determines Faulkner has carried his burden of showing a genuine issue of material fact exists as to whether or not Defendant Culliver directed the CERT team's actions on Nov. 9.

It is, therefore, recommended that summary judgment be **GRANTED in favor of Defendants Dunn, Stewart, Raybon, Kidd, Scarborough, Vignolo, Smith, Mixon, and Mitchell,** as to all claims asserted against them, and it is further recommended that summary judgment be **DENIED as to Defendant Grantt Culliver**, as to the claim of excessive force asserted against him.

## 2.  Defendants Who Did Not Use Force on November 9, 2016.

Defendants Akeen Edmonds, Omar Parker, James Griffin, Jasper Luitze, and Jason Norris conclusively deny using any force during the November 9 incident.[17]  The affidavits submitted by Edmonds, Parker, Griffin, Luitze, and Norris each declare that the officer was assigned to maintain a strategic position during the November 9 incident.  The officers affirm that they secured their posts and did not use force on inmates in B-Dorm on November 9.  Faulkner has failed to respond to these affirmations or rebut them in any way, and the record is further void of any indication or suggestion that these defendants personally used force against Faulkner on Nov. 9.  Consequently, Faulkner has failed to carry his burden of showing a genuine issue of material fact exists as to whether or not these defendants used excessive force against him.  Zatler v. Wainwright, 802 F.2d 397, 401 11th Cir. 1986) ("[S]ection 1983 requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation.").

Accordingly, it is recommended that summary judgment **be GRANTED in favor of Defendants Edmonds, Parker, Griffin, Luitze, and Norris** as to the claims of excessive force asserted against them.

## 3.  Defendants Who Deny Using Any Force on Plaintiff on November 9, 2016.

_____

[17] Akeem Edmonds affirms that he was assigned to a strategic position at the left of B-Dorm on November 9, 2016 and did not use any force during the incident. (Doc. 83-16). Omar Parker affirms that he remained at his strategic position at the front center of B-Dorm on Nov. 9.  (Doc. 83-15). James Griffin affirms that he stood watch atop the bathroom wall throughout the Nov. 9 incident.  (Doc. 83-23). Jasper Luitze affirms that he maintained his strategic post at the front right of B-Dorm on Nov. 9.  (Doc. 83-1). Jason Norris denies using forcing during the Nov. 9 incident. (Doc. 83-3).

Defendants Antonio McClain, Anthony Hadley, Alfie Pacheco, Henry Finklea, Larry McCovery, Marcus Gaston, Gregory Patterson, Danny Fountain, DeJour Knight, John Pryor, Bradly Walker, Dominic Whitley, David Dennis, Jesse Stanford, Steve Terry, and Jesse Wilson affirm by affidavits that they did not use any force on Faulkner on November 9.[18] Plaintiff Faulkner offers no evidence to refute this contention and further fails to connect any of these defendants to his version of the force used against him. Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir.) (finding that a conclusory allegation without supporting evidence is due to be discounted), cert. denied, 498 U.S. 1103, 111 S. Ct. 1003, 112 L. Ed. 2d 1085 (1991). The undersigned further finds that beyond mere acknowledgment these defendants are members of one of the three CERT teams that participated in the Nov. 9 contraband search, the record is void of facts connecting them personally to Faulkner's claims. LaMarca v. Turner, 995 F.2d 1526, 1536 (11th Cir. 1993) (A plaintiff must connect an official's act or omission to the alleged constitutional deprivation to establish liability in §1983). While the Court is required to draw all reasonable inferences in favor of the nonmoving party at the summary judgment stage, those inferences must be based on facts in the record. Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005). The Court, thus, finds Faulkner has failed to establish a causal connection between these defendants and the alleged harm suffered, and a reasonable jury would not be able to return a verdict for Plaintiff on the issue of excessive force against these defendants.

---

[18] (See Docs. 83-2, 83-4, 83-5, 83-7, 83-9, 83-11, 83-12, 83-13, 83-21, 83-22, 83-24, 83-25, 83-26, 83-28, 83-27, and 27-7, respectively).

Accordingly, it is recommended that summary judgment be **GRANTED in favor of Defendants Antonio McClain, Anthony Hadley, Alfie Pacheco, Henry Finklea, Larry McCovery, Marcus Gaston, Gregory Patterson, Danny Fountain, DeJour Knight, John Pryor, Bradly Walker, Dominic Whitley, David Dennis, Jesse Stanford, Steve Terry, and Jesse Wilson** on the claims of excessive force asserted against them.

### 4. Defendants Who Deny Excessive Force Used on November 9, 2016.

The remaining CERT team members in this action acknowledge being present in B-Dorm on Nov. 9 and admit to participating in the restraining, arrest, and escorting of inmates but deny that excessive force was used on any inmate, including Faulkner. The submitted affidavits of these officer defendants are summarized as follows:

Defendant William Streeter, Commander of the Southern Region CERT team, states that Faulkner was identified as a suspect from the Nov. 7 incident who was armed with a knife, circled the CERT team members in a threatening manner, and "communicated intent to inflict harm to staff." (Doc. 27-3 at 2-3). Faulkner "also appeared to take a leadership role in inciting other inmates to act out against the CERT team" on Nov. 7. On Nov. 9, the CERT team entered B-Dorm to arrest the suspects that were identified from the incident and to confiscate the prison made weapons "stockpiled" in B-Dorm. The CERT team walked through two other dorms to get to B-Dorm, and the inmates in those other dorms "were loudly letting inmates elsewhere, including those in B-Dormitory know that the CERT team was in the building and heading in that direction." (Id. at 3). Defendant Streeter avers that when the CERT team entered B-Dorm, which houses over 100 inmates, many of the inmates "were aggressively and angrily jumping up and down and ready to confront us." (Id.). The inmates (many of whom had weapons) were cursing, swapping beds and, with the "tents" still in place, "inmates were jumping out from behind these tents with weapons." (Id.). Faulkner was again "acting out" on Nov. 9 "near an area where someone was heard hollering 'knife' with combative and noncompliant inmates." (Id. at 4). Faulkner refused commands and repeated orders to lie down on his assigned bed and put his hands behind his back. Officers used "the minimal physical force needed, which included basic riot baton movements, to gain control over Faulkner and this increasingly dangerous situation."

(Id.).  The use of force stopped once Faulkner ceased resisting and was placed in restraints.  Defendant Streeter avers that he "had plain view" of B-Dorm on Nov. 9 and at no time did he "observe any type of abusive or excessive force being used against inmate Faulkner."  (Id. at 5).

Defendant Jeffery Baldwin, Commander of the North Central CERT team, declares that only the minimum amount of force was used against non-compliant inmates on November 9 to gain their compliance in being placed in flex cuffs.  He further affirms that he did not observe any abusive or excessive force used.  (Docs. 83-14).

Defendant Captain Darryl Fails avers that he was present when the CERT team entered B-Dorm but exited the dorm "because the CERT Team Commanders [were] in control."  (Doc. 27-6 at 1).  He further avers that he did not observe any members of the CERT team assault any inmate or use excessive force against any inmate.

Defendants Nathan McQuirter, Jermaine Bullard, Ernest Duren, and Charles Arthur affirm that "Inmate Faulkner became combative and refused to comply with the orders that were given which lead to the CERT team's usage of physical force that included basic riot baton movements in order to gain control of Inmate Faulkner."  The use of force ended once Faulkner stopped resisting and was able to be placed in the appropriate restraints.  The defendants aver that "the minimum amount of force necessary was used to control the situation" and "[a]t no time did [they] observe any type of abusive or excessive force being used against Inmate Faulkner by the CERT team."  The defendants further contend that their actions "were made in a professional manner and within the scope of [their] duties."  (Docs. 27-15 through 27-18).

Defendants Aaron Lewis and Timothy Robinson aver that they "entered B-Dorm and assisted other team members with escorting several inmates from their beds to the shower area.  [And,] also assisted with some inmates that were hiding under their beds."  The defendants deny observing any abuse, assault or excessive force used on any inmate.  (Docs. 83-19; 83-12).

Defendants Samuel Snelson, Daryl Brown, Corbin Tunstall, and Cordaro Melton aver that they assisted in securing inmates in flex cuffs and escorted inmates throughout the dorm area.  (Docs. 83-18, 83-17, 83-7, 83-10).

Defendants Demetrives Fleeton, Clifton Sanders, and nondefendant Terry Edwards, as members of the North Central CERT team, affirm their presence in B-Dorm on Nov. 9 during the incident but deny observing "any abuse, assault, or use of excessive force to any person."   Furthermore, Sanders, Jones, and Edwards deny knowing Faulkner or being able to identify him.  (Docs. 83-29, 83-6, 122-1).

Defendant Michael Harrison avers that he gave verbal commands to inmates to lay flat on their assigned beds and cross their legs at the ankles. Harrison assisted with securing inmates with flex cuffs to the rear and escorting them to the front of the dormitory to be positively identified prior to searching the inmates and their property for weapons and contraband. Harrison affirms that he did not observe any abuse, assault, or use of excessive force used against inmates, and further affirms that he does not know Faulkner, nor can he identify Faulkner. (Doc. 124-1).

Defendant Teddy Jones declares that he assisted in the search of B-Dorm on Nov. 9 as a member of the ADOC CERT team but has "no knowledge of assaulting inmate Quadarian Faulkner". (Doc. 103-1).

Furthermore, in response to Faulkner's claim that he returned to B-Dorm after receiving a body chart, where he was again beaten, before being taken to the healthcare unit, Defendants Streeter, Hadley, Pacheco, Finklea, and Fountain aver:

> Inmate Faulkner falsely alleges that 4 or 5 cert team members came to his bed dressed in full riot gear and allegedly hit him with a stick and then allegedly "beat" him all the way to the bathroom. This did not happen. He alleges that later CERT team members continued to "beat" him and called him derogatory names. This did not happen. Inmate Faulkner appears to allege that he was taken directly to segregation, without being treated by the healthcare unit, as they allegedly refused to treat him. This, too, is not true.

(Docs. 27-3 at 4-5, 83-4 at 5; 83-5 at 5; 83-8 at 5; 83-13 at 5). To determine whether or not the force used was excessive, the Court must apply the Whitley factors to the record facts. Whitley, 475 U.S. at 320-21 (To establish the constitutionality of force used courts are to analyze the "need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response.").

The evidence supporting whether or not force was necessary is in dispute. The law is clear that "prison guards do not have the luxury or obligation to convince every inmate that their orders are reasonable and well-thought out. Certainly they are not required to do so where an inmate repeatedly fails to follow those orders." Danley v. Allen, 540 F.3d 1298, 1307 (11th Cir. 2008), *overruled on other grounds as recognized by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010)).

> Discipline in a maximum security correctional institution no doubt is difficult, but it is essential if the prison is to function and provide for the care, safety and security of the staff and inmates. Services to provide food, clothing, health, medical, cleaning, laundry and all other services would come to end without discipline. Mob rule would take over. There would not, and could not, be any protection for staff or inmates. Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them. Someone must exercise authority and control. One can quickly reason what would happen in a maximum security prison without proper discipline.

Soto v. Dickey, 744 F.2d 1260, 1267 (7th Cir. 1984). Accordingly, "[p]rison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990). "The use of force must stop when the need for it to maintain or restore discipline no longer exists." Skrtich v. Thornton, 280 F.3d 1295, 1304 (11th Cir. 2002) (citation omitted).

Defendants contend Faulkner was "angrily defiant and refused to comply with direct and repeated orders that were given for him to lie down on his assigned bed and put his hands behind his back" (Doc. 27 at 8). Contrarily, Faulkner alleges he was lying face down on his bed, with his hands "zip tied" behind his back when four CERT team members surrounded his bed and beat him (doc. 106 at 4), and

the medical records lend support to his claim. Most notably, the medical records show no offensive or defensive wounds on Faulkner's body (or the other inmates who received body charts on Nov. 9),[19] supporting Faulkner's version of the facts that he was restrained when he was struck by the defendants. (Doc. 27-4 at 18).

The evidence supporting the amount of force used is also disputed. Defendants maintain that baton strikes were administered "towards the chest and back areas of the aggressive and combative subjects" (doc. 27-2 at 4) and that the "force was terminated once inmate Faulkner's resistance ceased" and he was placed in restraints. (Doc. 83 at 12). They further contend that Faulkner was then taken to the health care unit before being taken to the segregation unit. This version of the facts is supported by the record to the extent that : (1) Faulkner's body chart reflects that he sustained no injuries, made no complaints about breathing difficulties (only that his posterior hurt), and all of his vital signs were within normal ranges (including blood pressure at 113/85 and a pulse of 101) (doc. 27-4 at 18); and (2) the Initial Health Review Form completed prior to Faulkner's transfer to the segregation unit indicates no medical issues or problems were observed. (Doc. 54-5 at 33).

---

[19] The produced body charts of the B-Dorm inmates following the Nov. 9 incident overwhelmingly report superficial abrasions, slight swelling, redness, and/or discoloration to the areas of the upper back, shoulders, and ribs. (See Doc. 27-2 at 3-29). The majority of inmates examined voiced no complaints to the nursing staff at the time they were evaluated with the exception of two: (1) One inmate stated, "I was laying in my bed and someone hit me" (27-2 at 15); and (2) another inmate explained, "I haven't done a damn thing" (27-2 at 21). In addition, the body charts do not reflect wounds or cuts on the inmates' hands/forearms suggesting any offensive fighting, swinging, or blocking.

At the same time, however, the record does not contradict Faulkner's version of the facts, that he was beaten while on his bed and "all the way to the bathroom" and that he was again beaten after receiving a body chart but before being taken to the segregation unit. (Doc. 1 at 6). Despite Defendants' conclusive denial that at no time was Faulkner "beaten," they fail to address whether Faulkner was taken to B-Dorm after receiving a body chart (but prior to being taken to the segregation unit) and, if so, which officers were present in the dorm and what occurred. Defendants' response is thus insufficient to support that the force used was appropriate, given that the record substantiates that Faulkner did not receive a personal health evaluation prior to being placed in segregated housing on Nov. 9,[20] and the record irrefutably confirms that a collapsed lung was detected subsequent to Faulkner's placement in segregation.[21] Accordingly, Faulkner's claims are not belied by the record, and Faulkner has established a genuine issue of material fact as to the amount of force used and whether the force used was necessary.

---

[20]    The Initial Health Review form, signed by Nurse Wall, appears to have been compiled at that exact time as the body chart was completed, as it reports the exact time and vital signs readings as the body chart and the "Assessment" section of the form states, "see original body chart". (Doc. 54-5 at 33). Moreover, Nurse Wall affirms by affidavit that although she signed the form for restrictive housing, she did not "assess" Faulkner on Nov. 9. (Doc. 54-3 at 2).

[21]    The record confirms Faulkner was examined in the health care unit the following day, November 10, 2016, for complaints of breathing difficulties and chest pain, stating that "he got whooped", and his vital signs reflected elevated readings, including a blood pressure reading of 158/100 and a pulse of 122. (Doc. 54-5 at 8). And, the November 10, 2016 consultation request completed by Holman's physician (for Faulkner's transfer to the local hospital for a chest x-ray) states, "Patient was involved in a one on one with correctional officers and complains of difficulty breathing and severe chest pain" that started the day before, Nov. 9. (Doc. 27-5 at 15).

As to the threat perceived by Defendants and efforts to temper the response, the record evidence is, again, inconclusive. Defendants present facts demonstrating that Holman's B-Dorm was a hostile, threatening, and unsafe environment. The record evidences that it housed gangs, gang leaders, and was known to be a violent environment. It is also evident that the inmates housed in B-Dorm had erected "tents" throughout the dormitory making visual sight difficult and had accumulated numerous handmade weapons. The perceived threat to the CERT team members at the time of the Nov. 9 incident, however, is less clear.

Defendants expound that on the morning of Nov. 9, B-Dorm inmates were forewarned by preceding dormitories that the CERT team was headed there, and many of the B-Dorm inmates were jumping up and down, ready to confront the CERT team when it entered. Defendants further contend that the CERT team, dressed in full tactical gear, armed with lethal and nonlethal weapons, ordered all inmates "to report to their assigned beds, lie down, and place their hands behind their back, and several inmates, including Faulkner, refused to obey the "verbal commands" of the CERT team and made threats against the CERT team while armed with knives and broom handles. (Doc. 27 at 3). Defendants assert that the force was limited to baton strikes and only minor injuries were inflicted, supported by the body charts received.[22]  Contrarily, Faulkner alleges that the CERT team

_____

[22] The Supreme Court has recognized that an inmate "who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." Wilkins v. Gaddy, 559 U.S. 34, 38-39, 130 S. Ct. 1175, `75 L. Ed. 2d 995 (2010). The Court explained that the "core judicial inquiry" of an Eighth Amendment excessive force claim is based on "the nature of the force" used, not the injury sustained. Id. at 39.

entered a sleeping B-Dorm on Nov. 9 and immediately began shouting insults at inmates and assaulting them. Faulkner argues that "[i]t does not take a genius to see that the inmates were completely unarmed and did not stand a chance against any of the CERT team members so they all were in compliance, lying face down on their individual beds." (Doc. 106 at 4). He further contends that the CERT team then "zip tied" the inmates with their hands behind their backs, leaving the inmates "restrained and unable to fight back." (Id.). Consequently, the question of the perceived threat and efforts to temper the force used cannot be discerned from the record and instead raise issues of credibility, which cannot be determined on summary judgment. Miller v. Harget, 458 F.3d 1251, 1256 (11th Cir.2006) ("Even if the district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.").

Given the facts of this action, taken in the light most favorable to Faulkner as the nonmovant, a reasonable jury could find that the CERT Team members Nathan McQuirter, Jermaine Bullard, Ernest Duren, and Charles Arthur acted intentionally to cause harm to Plaintiff, Hudson, 503 U.S. at 6-8, that such conduct "shocks the conscience," Lumley, 327 F.3d at 1196, and find these defendants liable for a constitutional violation. Furthermore, given the remaining questions of fact as to whether or not force was used against Faulkner after he received a body chart, a reasonable jury could find that any CERT team member who has not specifically denied using force on Faulkner may have utilized force. Therefore, the undersigned determines that summary judgment is premature and recommends

that **Defendants McQuirter, Bullard, Duren, Arthur, Baldwin, Streeter, Fails, Lewis, Fleeton, Robinson, Snelson, Brown, Tunstall, Sanders, Melton, Jones, Harrison and Grantt Culliver** (for the reasons previously discussed in section B., a., 1) be **DENIED** summary judgment at this time.

### b. Failure to Protect.

A prison official violates the Eighth Amendment when he or she acts with deliberate indifference to a substantial risk of serious harm to an inmate. <u>Farmer v. Brennan</u>, 511 U.S. 825, 828, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). "An officer who is present at the scene [of an altercation] and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable for his nonfeasance." <u>Hadley v. Gutierrez</u>, 526 F.3d 1324, 1330 (11th Cir. 2008). But, an officer may only be liable for failing to protect if the officer was in a position to intervene yet failed to do so. <u>Priester v. City of Riviera Beach, Fla.</u>, 208 F.3d 919, 924 (11th Cir. 2000). As previously discussed, it is unclear at this time whether or not excessive force was used against Faulkner on November 9, 2016. Similarly, it cannot be determined from the sparse affidavit responses of the defendants what each observed or his position in relation to Faulkner to determine if the defendant was reasonably able to protect Faulkner.

Based on Faulkner's complaint allegations, any CERT team officer who removed Faulkner from his bed, escorted him to the bathroom area, was present in the bathroom area, escorted him to and from the health care unit, and was present in B-Dorm prior to the charged inmates being taken to the segregation unit may be

liable for failing to protect him.[23]  Given the lack of specificity contained in the affi-

davits of the defendants, it is premature to grant summary judgment to any CERT

team member who was present in B-Dorm and may have been in a position to

intervene in the alleged use of force.  See Giles v. Kearney, 571 F.3d 318, 327 (3d

Cir. 2009) ("No reasonable officer could agree that striking and kicking a subdued,

nonresisting inmate in the side, with force enough to cause a broken rib and col-

lapsed lung, was reasonable or necessary under established law.").

As to the supervisory defendants, Faulkner has failed to plead any facts

indicating that any supervisory defendant was present in B-Dorm on November 9,

2016 or was in a position to reasonably act to protect Faulkner, with the exception

of Defendant Culliver, supervisor of the CERT team.  Based on the alleged fact

that Culliver ordered that the CERT team to "takeover" Holman and "show those

inmates . . . who the actual boss is" (doc. 118 at 4), a trier of fact could reasonably

find that such comments indicate that Defendant Culliver directed excessive force

to be used on the inmates or that Defendant Culliver was aware that the CERT

Team entered B-Dorm with the intent of using excessive force against the inmates,

including Faulkner.

---

[23]  Faulkner's claim that after being taken to the health care unit:

> the riot team members took me back to B-Dorm and continue to beat
> me and call me derogatory names, I was asking the other officers
> that was standing around for help, and heard some of them say fuck
> you, you didn't ask for help Monday.  After they finished beating the
> inmates, me and several other inmates that was beaten unconscious
> were taken to segregation, where I laid up in a cell begging for help…

(Doc. 1 at 6) potentially broadens his excessive force claim beyond the original "4
or 5" CERT team members responsible for removing Faulkner from his bed.

Consequently, summary judgment is **DENIED** as to **Defendants Culliver, Fails, Edmonds, Parker, Griffin, Luitz, Norris, McClain, Hadley, Pacheco, Finklea, McCovery, Gaston, Patterson, Fountain, Knight, Pryor, Walker, Whitley, Dennis, Stanford, Terry, Wilson, McQuirter, Bullard, Duren, Arthur, Baldwin, Streeter, Lewis, Fleeton, Robinson, Snelson, Brown, Tunstall, Sanders, Melton, Harrison, and Jones** on the failure to protect claim and **GRANTED** as to **all other named defendant officers**.

### c.  Assault and Battery.

Faulkner asserts state law claims of assault and battery against the correctional officer defendants.  As discussed *supra,* there remains a question of material fact as to the appropriateness of force used against Faulkner.  Similarly, there remains a question as to whether or not CERT Team defendants are liable for state law assault claims.  Out of an abundance of caution, it is recommended that the state law claims of assault and battery be carried along with the alleged Eighth Amendment violations of excessive force.  Accordingly, **Defendants Culliver, McQuirter, Bullard, Duren, Arthur, Baldwin, Streeter, Fails, Lewis, Fleeton, Robinson, Snelson, Brown, Tunstall, Sanders, Melton, Jones, and Harrison** are **DENIED** summary judgment as to the claim of assault and battery, at this time.

It is further recommended that the **remaining officer Defendants** be **GRANTED** summary judgment as the state law claims of assault and battery asserted against them and that such claims be dismissed for failure to state a claim.

### d.  Denial of Medical Care.

The Eighth Amendment prohibits indifference to a convicted prisoner's serious medical needs so deliberate that it "constitutes the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). "To prevail on a claim of deliberate indifference, a plaintiff must show: (1) a serious medical need; (2) defendant's deliberate indifference to that need; and (3) causation between the defendant's indifference and the plaintiff's injury." McDaniels v. Lee, 405 F. App'x 456, 458 (11th Cir. 2010) (citing Mann v. TaserInt'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009)).  To satisfy the first objective element, Faulkner must prove his condition was, in fact, a serious medical need.  "A 'serious medical need' is one that is diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment." Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1317 (11th Cir. 2010) (internal quotations omitted).  "To satisfy the subjective element of [a] deliberate indifference [claim, a] . . . Plaintiff must prove three subparts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005) (internal quotations omitted) (noting that subjective knowledge requires that defendant "'must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* [ ] must also draw the inference'") (quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811, (1994)); see also Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir. 2010).

Faulkner alleges generally that Correctional Officers Stewart, Raybon, Mitchell, Fails, Kidd, Scarborough, Vignolo, the CERT team defendants, and Nurses Wall and Langford failed to provide him medical care following the Nov. 9 incident. Faulkner further alleges that the medical staff failed to clean and/or re-move the sutures he received in connection with the surgical repair to inflate his collapsed lung.

The record shows Faulkner received an examination and body chart on Nov. 9 by Nurse Weathers following the Nov. 9 incident. Although Faulkner alleges that the body chart depicts an incomplete exam and does not report the breathing complaints he expressed, Faulkner does not dispute the findings and observations that are noted on the report. Consequently, the record confirms Faulkner had a slightly raised pulsed, with normal blood pressure, and that his lungs were clear bilaterally. (Doc. 54-5 at 32). The body chart is also void of any abrasions, bruis-ing, discoloration, or any markings on any part of Faulkner's body, and Faulkner does not contend any existed. (Id.). While his complaints of breathing difficulties may not have been noted on the chart as he alleges,[24] an examination of his lungs was performed, and his lungs were found to be clear at that time. Consequently, Faulkner cannot show that he was denied medical care or that a serious medical

_____

[24] In response to this motion, Faulkner claims that he and other inmates were "abu-sively" taken to the medical unit, where the medical staff, "under the guidance of CERT members present, did very little investigation into the physical well being of Faulkner, missing definitive symptoms that Faulkner complained of and did allow the CERT members, and ADOC prison guards working in unison with CERT, to take Faulkner to the Segregation Unit, . . . that was almost the death of Faulkner that did suffer pain . . . throughout the long hours of night-time . . . ." (Doc. 126 at 2).

need was ignored.  At most, Faulkner's facts establish negligence, not deliberate indifference.  See Wilson v. Seiter, 501 U.S. 294, 305, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (mere negligence does not satisfy the deliberate indifference standard).  Deliberate indifference requires more than a showing of negligence or medical malpractice, and a misdiagnosis will not suffice.  McElligott v. Foley, 182 F.3d 1248, 1256 (11th Cir. 1999) (holding that although "failure to diagnose can be deemed extremely negligent, it does not cross the line to deliberate indifference.").  Deliberate indifference is also not established where an inmate receives care but desired different modes of treatment.  Hamm v. DeKalb Cnty., 774 F.2d 1567, 1575 (11th Cir. 1985).  There is simply no evidence that listening to Faulkner's lungs and finding them clear was an objectively unreasonable response to Faulkner's complaints of difficulty breathing and chest pain as alleged.  The record is void of evidence that the defendants acted with an attitude of deliberate indifference to Faulkner's condition; thus he has failed to meet the subjective criteria of a valid § 1983 claim.  Estelle, 429 U.S. at 107 ("A medical decision not to order an Xray, or like measures, does not represent cruel and unusual punishment.").  Accordingly, Faulkner's claim for denial of medical care against any defendant fails, as it relates to medical treatment directly following the Nov. 9 CERT team restraint of inmates.

In his complaint, Faulkner further alleges that, after he received a body chart, he was taken back to B-Dorm where "the riot team members" continued to beat him, and "[a]fter they finished beating the inmates, [he] and several other inmates that was beaten unconscious were taken to segregation, where [he] laid up in a cell begging for help, [] felt like [he] was dieing [] was in so much pain, [he]

could not breathe." (Doc. 1 at 6). He further claims he wrote letters to the Warden and Captain asking for help and begged an I.C.S. officer (who was in the segregation unit) for help, and finally two CERT team members took him to the health care unit where he received treatment for chest pain. Faulkner's responses to Defendants' special reports and to this motion, however, are void of the allegations that he was taken back to B-Dorm after receiving a body chart, that he was beaten after receiving a body chart, and/or that he was beaten unconscious. Instead, Faulkner states that he was taken to the segregation unit ("one man celling, punishment cells"), where he suffered physical and mental pain throughout the night, until November 10, 2016, wen "a correction officer that worked the Segregation Unit regularly, took Faulkner from the lock up cell back to the infirmary where the prison medical staff diagnosed Faulkner with broken, splintered ribs that punctured Faulkner's lung." (Doc. 126 at 2) (capitalization altered). The medical evaluation on November 10, 2016 evidences that Faulkner presented with numerous complaints of breathing difficulties and shortness of breath; he ranked his pain as a 10 out of 10; his pulse and blood pressure were elevated; he explained, "I got whooped". (Doc. 54-5 at 8). Upon examination, it was determined that Faulkner had no breath sounds in his left lung, and he was transported to the local hospital for medical treatment. (Id.).

In determining whether Defendants denied Faulkner medical care in violation of the Eighth Amendment, the Court acknowledges that a collapsed lung is an objectively serious medical need that, if left untreated, "pos[es] a substantial risk of serious harm." Farmer, 511 U.S. at 834. Faulkner, however, must also establish

the subjective component of his claim, that the defendants knew he had a collapsed lung or a serious medical need and denied him medical care "in order to punish", Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000) (citing Wilson v. Seiter, 501 U.S. 294, 300, 121 S. ct. 774, 148 L. Ed. 2d 673 (2001) ("The source of the intent requirement is not the predilections of this Court, but in the Eighth Amendment itself, which bans only cruel and unusual *punishment*. If the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify." (emphasis in original)), and he fails to do so.

Faulkner broadly alleges, "ALL Day [he] complained of severe pain and difficulty breathing." (Doc. 106 at 5). However, Faulkner does not articulate making any claims for help until he was in his segregation cell and further fails to show that any defendant was subjectively aware of a serious medical need while he was housed in the segregation unit. (See Doc. 1 at 6). Specifically, Faulkner asserts that he "wrote letters to the Warden and Captain asking for help" (doc. 1 at 6), but there is no indication that either supervisor ever received a letter from Faulkner or had knowledge of his serious medical need prior to his receipt of medical care.[25]

---

[25] Faulkner further alleges:

> The I.C.S. officer came back there and I begged him to please get me some help because I could not breathe, finally two cert team members came and took me to the health care . . .

(Doc. 1 at 6). To the extent Faulkner alleges the I.C.S. officer is liable for failing to provide Faulkner with medical care, the I.C.S. officer is not a party to this action, as Faulkner has not properly identified the officer, nor has he been served with this suit. However, it appears from the complaint that the "I.C.S. officer" did not ignore Faulkner's medical need and, instead, acted to get Faulkner help through the two officers that came to his cell and escorted him to the health care unit. Accordingly,

Faulkner further alleges he "begged for help" in his cell. (Id.). However, there are no allegations asserted or facts suggesting that any named defendant heard his pleas for help and failed to provide him medical care with knowledge he suffered a serious medical need.[26] Notably, inadvertent or negligent failure to provide medical care is insufficient to constitute an unnecessary and wanton infliction of pain or to be "repugnant to the conscience of mankind." Daniels v. Williams, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed.2d 662 (1986). Indeed, Faulkner admits that the segregation officer making routine rounds escorted him to the infirmary where he received medical treatment.[27] Accordingly, Faulkner has not established that Defendants failed to provide him medical care in violation of the Eighth Amendment, as there is no suggestion that any named defendant had subjective knowledge of a serious medical need and ignored the same.

Indeed, the record confirms, and Faulkner admits, that he was taken to the medical unit on November 10, 2016, where he received appropriate and prompt medical treatment, including an assessment which detected a clear right lung but

---

there can be no liability on the part of the "I.C.S. officer" for denial of medical care.

[26] Likewise, Faulkner does not allege that other inmates heard his cries for help and/or witnessed the denial of medical treatment by the defendants.

[27] The Court notes that it remains unclear from the pleadings whether Faulkner asserts that two CERT officers removed him from his cell and took him to the healthcare unit (doc. 1 at 6) or whether a correctional officer making routine rounds in the segregation unit escorted him (doc. 126 at 2). This discrepancy, however, is immaterial to the court's analysis of the subjective knowledge of the named defendants and has no bearing on Faulkner's failure to establish a constitutional violation for denial of medical care.

no sounds in his left lung, indicating a collapsed lung. The examining nurse referred Faulkner to the Medical Director for an examination and, after an inconclusive EKG was performed, the Medical Director initiated the process to have Faulkner transported off site to the local hospital. A chest x-ray at the local hospital confirmed a pneumothorax (total collapsed lung) and the Medical Director initiated the process to have Faulkner transported and admitted to Mobile Infirmary for a surgical procedure to repair Faulkner's lung. This procedure required insertion of a tube into the lung to expand it. The procedure was performed and was successful, and Faulkner returned to the segregation unit of Holman on November 14, 2016. In accordance with the hospital discharge instructions, Faulkner was prescribed and received prescriptions for a muscle relaxer, pain medication, and medication to combat constipation.

Turning to Faulkner's allegations against the medical defendants, he generally alleges the medical staff denied him medical treatment and left his stitches in him for over a month, failing to clean his wounds "causing greenish coloration." (Doc. 1 at 6). He further alleges at the time of filing this suit, he still has difficulties breathing. According to Faulkner's complaint, only Nurses Wall and Langford have been named as medical defendants in this action. Notably, Faulkner's pleadings are void of any specific allegations which Nurses Wall or Langford did or failed to do which caused Faulkner any injury.

Defendant Nurse Langford affirms he did not see or examine Faulkner following the Nov. 9 incident until November 18, 2016, when completing pill call in

the segregation unit, during which time Nurse Langford did not "observe any indications that Mr. Faulkner required additional medical care" nor did Faulkner request any medical care or complaints. (Doc. 54-2 at 3). Defendant Langford further avers the same for the following dates, November 25 and 27, 2016. (Id.). Similarly, Defendant Nurse Wall avers that she has never denied Faulkner medical treatment. Defendant Wall affirms, "[a]lthough I completed the form noting Mr. Faulkner's placement in restrictive housing, I did not assess Mr. Faulkner on November 9, 2016. Another member of the nursing staff assessed Mr. Faulkner following the November 9, 2016, altercation and checked his vital signs. Mr. Faulkner never requested additional care from me following the nurse's November 9, 2016, assessment or voiced concerns to me regarding the care provided to him." (Doc. 54-3 at 2). Defendant Wall further affirms that she saw Faulkner on November 19, 2016 during pill call rounds in segregation (and on other dates during pill call rounds) and that Faulkner "did not express any complaints" to her regarding his medical care nor did she visually assess any need for care. (Id. at 3). Faulkner does not dispute the version of facts put forth by the medical defendants.

Additionally, the medical record shows that on November 20, 2016, Faulkner submitted a sick call request form complaining of lingering chest discomfort. However, Faulkner refused to attend the scheduled appointment. (Doc. 54-5 at 7). Faulkner was then assessed on August 22, 2017 following complaints of difficulty breathing and pain that comes and goes on his left side; the evaluating nurse detected clear lungs, normal respiration, and normal vital signs, and Faulkner was instructed to return to the healthcare unit if additional care for his lungs was

needed. (Doc. 54-5 at 4-5). There is no evidence of record to suggest that Faulkner ever complained of needing medical treatment, nor did he complain of wound complications, or return to Holman's healthcare unit thereafter.

Furthermore, the record is void of any indication that Faulkner actually received stitches in connection with his collapsed lung. The hospital discharge forms do not mention sutures, care of sutures, or removal of sutures, and the medical defendants deny that this procedure typically requires stitches. Even assuming Faulkner received stitches and that they were not cleaned as alleged, he has failed to show an Eighth Amendment violation. "To prevail on a claim of deliberate indifference, a plaintiff must show that deliberate indifference to a serious medical need caused the plaintiff's injury. See McDaniels v. Lee, 405 F. App'x 456, 458 (11th Cir. 2010) (citing Mann v .Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2010)). Faulkner has failed to provide any allegation or evidence that the denial or delay in removal of the stitches worsened his condition or caused him any actual harm.

Accordingly, Faulkner has failed to establish a constitutional violation for denial of medical care against any defendant. His allegations of an incomplete body chart and examination reflect negligence at best, and he has failed to sufficiently allege or show that, following his receipt of a body chart, any defendant had subjective knowledge of a serious medical need, i.e., punctured lung. Additionally, the record belies Faulkner's claim entirely that Nurses Wall and Langford were deliberately indifferent to his medical needs and/or failed to clean and remove his sutures following surgery to repair his punctured lung. Consequently, summary

judgment is **GRANTED** in favor of **Defendants Wall and Langford** on the claims asserted against them, and the Court further recommends that summary judgment be **GRANTED** in favor of **all officer defendants** as to Faulkner's claims of denial of medical care.

### C.    Request for Declaratory and Injunctive Relief.

In addition to monetary relief, Faulkner requests a declaratory judgment and injunctive relief.  A remedy for declaratory relief is created by 28 U.S.C. § 2201(a), which provides that "[i]n a case of actual controversy . . . any court of the United States, . . . may declare the rights and other legal relations of any interested party seeking such declaration[.]" 28 U.S.C. § 2201(a).  "Declaratory relief is by its nature prospective." McGee v. Solicitor Gen. for Richmond Cnty., Ga., 727 F.3d 1322, 1325 (11th Cir. 2013). That is, it is "[i]n contrast . . . [to] a claim for money damages [that] looks back in time and is intended to redress a past injury." Adler v. Duval Cnty. Sch. Bd., 112 F.3d 1475, 1477 (11th Cir. 1997).  Thus, to have standing to seek declaratory relief, a plaintiff "'must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future.'" Koziara v. City of Cassel-berry, 392 F.3d 1302, 1305 (11th Cir. 2004) (quoting Johnson v. Bd. of Regents, 263 F.3d 1234, 1265 (11th Cir. 2001)).  "[T]he continuing controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury." Emory v. Peeler, 756 F.2d 1547, 1552 (11th Cir. 1985).  A remote possibility of a future injury occurring is not adequate to meet the "actual controversy" requirement for declaratory relief. Id. The plaintiff must allege facts from which the continuation of the dispute may be

reasonably inferred. <u>Ciudadanos Unidos de San Juan v. Hidalgo Cnty. Grand Jury Comm'rs</u>, 622 F.2d 807, 821-22 (5th Cir. 1980), <u>cert. denied</u>, 450 U.S. 964, 101 S. Ct. 1479, 67 L. Ed. 2d 613 (1981).

Faulkner has not made a specific showing (or even an allegation) of any likelihood of being subjected to unlawful conduct by a named Defendant in the future.  <u>See</u> <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 104, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983) (merely asserting that one may again be subject to unlawful conduct does not generally give rise to standing to demand prospective relief). Indeed, the record reflects that Faulkner was transferred from Holman and is currently incarcerated at St. Clair Correctional Facility.  Thus, Faulkner's claim for declaratory relief fails "to satisfy the threshold 'case or controversy' requirement of article III and the 'actual controversy' prerequisite of 28 U.S.C. § 2201" and, therefore, is subject to dismissal. <u>See</u> <u>Emory</u>, 756 F.2d at 1552.

Similarly, "[b]ecause injunctions regulate future conduct, a party has standing to seek injunctive relief if the party alleges . . . a real and immediate – as opposed to a merely conjectural or hypothetical---threat of *future* injury."  <u>Church v. City of Huntsville</u>, 30 F. 3d 1332, 1337 (11th Cir. 1994) (emphasis in original).  A review of Faulkner's complaint reveals no allegation or claim of future harm.  Accordingly, Faulkner's claim for injunctive relief is due to be dismissed.

## IV.  Conclusion.

Based on the foregoing, the undersigned recommends the following:

1.  As to Plaintiff's Eighth Amendment violation for denial of medical care, summary judgment should be **GRANTED** in favor of all Defendants;

2. As to Plaintiff's Eighth Amendment claim of excessive force and state claim of assault and battery, summary judgment should be **GRANTED in part** and **DENIED in part**. For the reasons discussed previously, summary judgment should be **GRANTED** in favor of **Defendants Dunn, Stewart, Raybon, Kidd, Scarborough, Vignolo, Smith, Mixon, Mitchell, Edmonds, Parker, Griffin, Luitze, Norris, Antonio McClain, Anthony Hadley, Alfie Pacheco, Henry Finklea, Larry McCovery, Marcus Gaston, Gregory Patterson, Danny Fountain, DeJour Knight, John Pryor, Bradly Walker, Dominic Whitley, David Dennis, Jesse Stanford, Steve Terry, and Jesse Wilson,** and **DENIED** as to **Defendants McQuirter, Bullard, Duren, Arthur, Baldwin, Streeter, Fails, Lewis, Fleeton, Robinson, Snelson, Brown, Tunstall, Sanders, Melton, Jones, Harrison and Grantt Culliver**.

3. As to Plaintiff's Eighth Amendment failure to protect claim, summary judgment should be **DENIED** as to **Defendants Culliver, Fails, Edmonds, Parker, Griffin, Luitz, Norris, McClain, Hadley, Pacheco, Finklea, McCovery, Gaston, Patterson, Fountain, Knight, Pryor, Walker, Whitley, Dennis, Stanford, Terry, Wilson, McQuirter, Bullard, Duren, Arthur, Baldwin, Streeter, Lewis, Fleeton, Robinson, Snelson, Brown, Tunstall, Sanders, Melton, Harrison, and Jones** and **GRANTED** as to **all other named officer defendants.**

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or

anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b); S.D. ALA. L.R. 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 6th day of November, 2019.

s/ P. Bradley Murray
**UNITED STATES MAGISTRATE JUDGE**